**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**TRAVIS L. ADAMS,**

      **Plaintiff,**

**vs.**                                   **CASE NO. 4:05CV450-MP/AK**

**DR. MAXIMO VELASCO, et al,**

      **Defendants.**

_____/


## REPORT AND RECOMMENDATION

Plaintiff brings this cause of action pursuant to 42 U.S.C. §1983 alleging that the defendants, medical staff at Madison Correctional Institution, have been deliberately indifferent to his serious medical needs. (Doc. 42). Defendants have filed motions for summary judgment, (docs. 121 and 123), and Plaintiff has responded. (Doc. 173).

For the reasons explained herein, it is respectfully recommended that Plaintiff's second amended complaint be dismissed for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. §1915(e)(2).

**I.    Allegations of the Second Amended Complaint (doc. 42)**

Plaintiff claims that he has right knee problems and was told by the VA that he needed reconstructive surgery and should not work. He complained to the "medical staff" that his job as a boot repairer caused him significant pain because he was standing all day long. His next job assignment required walking six hours a day picking

up trash, and this, too, caused him significant pain. Despite his complaints, "medical" told him that there was nothing wrong with his knee and refused to give him a job change. Plaintiff was also denied knee braces and other orthopedic support devices.

Plaintiff claims that Dr. Velasco denied him treatment for his liver disease because Plaintiff was going to be released in 9 months. Plaintiff also asked Dr. Velasco for a knee brace, but was told that he could not get a brace unless he had surgery. Despite contact from mental health about Plaintiff's pain levels, Dr. Velasco refused to treat his knee condition.

Plaintiff asked Defendant King to help him, but she suggested only that he see Dr. Velasco again.

Plaintiff was examined by Defendant Pinkard, but she told him to take Tylenol even though it was bad for his liver. She also denied him a referral to see Dr. Velasco and diagnosed him herself, which she is not qualified to do, resulting in him being given a clean bill of health with no passes such that he was forced to return to work walking the grounds.

Plaintiff returned to Defendant King asking that she refer him to an orthopedist at RMC, but she told him she was not authorized to make a referral only Dr. Velasco could. She suggested that he again return on sick call to Defendant Pinkard and ask to see Dr. Velasco.

When Defendant Hernandez replaced Dr. Velasco as Chief Medical Officer, he simply "signed off" on Dr. Velasco's findings without actually making independent findings, and he denied Plaintiff a brace, too.

**No. 4:05cv450-MP/AK**

Later, Plaintiff found out that Defendant King had prevented him from seeing the Chief Health Officer Hernandez "by way of the ADA," even though she knew that he had a disability. Defendant King also denied him medication that he could have received from the VA.

Plaintiff then wrote Defendant Cherry, Director of Prison Health Services, who concurred with previous findings by Drs. Velasco and Hernandez and referred to the appropriate symptomatic treatment plan in his medical records, which Plaintiff contends was not in his file. Plaintiff claims that Dr. Cherry was deliberately indifferent to his serious needs when he suggested that he pursue surgery upon his release from the DOC in May 2006.

Finally, Plaintiff contends that Nurse Bryan "interrogated" him about his medical condition, and then referred him back to Dr. Cherry. He also contends that Defendant Bryan was present when he was reviewing his medical file and she witnessed his "positive draw," as well has listened to his complaints of severe pain, but she "downplayed" his problems in her report to Dr. Cherry and told Dr. Cherry that Plaintiff had an adequate treatment regimen when in fact he had none.

With no support from medical, Plaintiff claims that he was required to work beyond his capabilities or risk getting a disciplinary report and that this resulted in damage to his left knee and both of his feet. Plaintiff explains that he was released from the DOC, but re-arrested and returned to prison. During his release he obtained a DVA rating that showed his condition had been made worse.

**No. 4:05cv450-MP/AK**

Plaintiff seeks declaratory and injunctive relief ordering his immediate medical treatment, and compensatory and punitive damages.

a)      DVA Rating Decision dated 9/8/2006 (marked Supp to Exhibit E)[1]

Shows that Plaintiff has 30 percent disability becuase of his right knee, but his left knee condition and the problems with his feet do not appear to be service connected.

b)      Exhibit H

Plaintiff explains that he was arrested on July 22, 2006, and held in the Sarasota County Jail where a nurse practitioner diagnosed his right knee condition without need of x-rays, told him he would get surgery for his knee, and gave him a low bunk pass. He also obtained a leg brace.  (Doc. 45, p. 7).

## II.    Standard of Review

A district court should grant summary judgment when, "after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case." Nolen v. Boca Raton Community Hospital, Inc., 373 F.3d 1151, 1154 (11th Cir. 2004), *citing* Celotex Corporation v. Catrett, 477 U.S. 317, 322 (1986).  All issues of material fact should be resolved in favor of the Plaintiff or non-moving party before the Court determines the legal question of whether the defendant is entitled to judgment as a matter of law under that version of the facts. Durruthy v. Pastor, 351 F.3d 1080, 1084 (11th Cir. 2003); Skrtich v. Thornton, 280 F.3d 1295, 1299 (11th Cir. 2002).   The Plaintiff has the burden to come forward with

---

[1]  There are no exhibits marked A through E attached to the pleading.

**No. 4:05cv450-MP/AK**

evidentiary material demonstrating a genuine issue of fact for trial.  <u>Celotex</u>, 477 U.S. at 322-23.  Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, <u>Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation</u>, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient.  There must be such evidence that a jury could reasonably return a verdict for the party bearing the burden of proof.  <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 251, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202 (1986).  "For factual issues to be considered genuine, they must have a real basis in the record."  <u>Mize v. Jefferson City Board of Education</u>, 93 F.3d 739, 742 (11th Cir. 1996).

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' "  <u>Owen v. Wille</u>, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting* <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  <u>Owen v. Wille</u>, 117 F.3d at 1236; <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553.

While a moving party is not required to support his motion for summary judgment with affidavits, <u>Celotex</u>, <u>supra</u> at 323, the facts stated in uncontradicted affidavits or other evidentiary materials must be accepted as true for purposes of summary judgment.  <u>Gauck v. Meleski</u>, 346 F.2d 433, 436 (5th Cir. 1965).

**No. 4:05cv450-MP/AK**

**III.    Defendants' Rule 56(e) relevant evidence (docs. 121, 123)**

a)    <u>Affidavit of Maximo Velasco (exhibit A)</u>

Dr. Velasco reviewed Plaintiff's medical file and recalls that a blood test he ordered resulted in a positive screen for hepatitis.  Because Plaintiff's sentence expired in a few months and his hepatitis C was asymptomatic at the time, he was not referred for treatment and it was suggested that he be treated by the VA upon his release. Dr. Velasco does not recall treating Plaintiff for his knee problems and there are no treatment notes that indicate otherwise.

b)    <u>Inmate Grievance dated 9/9/05 (exhibit B)</u>

c)    <u>Affidavit of Dr. Daniel Cherry (exhibit C)</u>

Dr. Cherry attests that he did not actually treat Plaintiff, his only interaction was in response to a letter from Plaintiff saying that he wanted a knee brace.  Dr. Cherry responded that it appeared Plaintiff's care was appropriate to the situation, he already had a pass for a soft brace and it was Dr. Cherry's opinion that an additional brace would only have been helpful if Plaintiff was attempting sports activities.  Dr. Cherry did not make any health care decisions for Plaintiff and did not discuss his health care with any of Plaintiff's health care providers.

d)    <u>Letter from Dr. Cherry (exhibit D)</u>

Dr. Cherry explained that because Plaintiff was being released in May, 2006, he should pursue surgery with the VA since there was not enough time to arrange for the process within the prison system to allow for appropriate follow up care and most

**No. 4:05cv450-MP/AK**

surgeons do not like to perform procedures when they cannot be involved in the total care, including follow up. He explained that if the surgery were required on an emergency basis, of course, there would be no hesitancy, but a delay in surgery did not appear likely to cause him "untoward problems."

    e)    <u>Affidavit of Lynne King (exhibit E)</u>

King attests that she does not render medical care to inmates, she responds to requests and grievances related to medical care. As such, she responded to his requests for referral to a specialist with proper references to procedure that requires him to initiate sick call requests to see the doctor. She had no authority nor did she ever deny or ignore his specific medical requests.

    f)    <u>Inmate Request dated 9/26/05 (exhibit F-1)</u>

King responded to the inmate request for a specialist that only one sick call was in his file related to a knee problem and she told him only a doctor could refer him, but if the problem persisted initiate sick call again.

    g)    <u>Inmate Request dated 10/4/05 (exhibit F-2)</u>

King again responded that only a doctor could refer him to a specialist, and that previous examination did not indicate a knee problem, but another sick call request was the only way to proceed.

    h)    <u>Inmate Request dated 10/8/05 (exhibit F-3)</u>

In response to Plaintiff's complaints of continued knee pain, King responded: "Record review indicates that you have only initiated sick call one time on 9/27/05 regarding your knee pain. If you are still in pain you need to go to sick call."

**No. 4:05cv450-MP/AK**

i)    Inmate Request dated 10/11/05 (exhibit F-4)

King responds:

You are not being denied medical treatment.  However, when you went to
sick call with your knee before, the nurse could not find anything what
would necessitate a referral to the Doctor.  If you present to sick call more
than once with the same problem you should be referred to the Doctor.  I
am sending back your paperwork from the VA.  If you want this added to
your medical record please send it to Ms. Harris in medical records.  She
is in charge of the records and I can't add anything to the chart.

j)    Affidavit of Joanna Bryan (exhibit G)

Bryan is Nurse Supervisor at Madison CI.  She has reviewed plaintiff's claims

and his medical records and notes that when Plaintiff asked Dr. Velasco for treatment

for his hepatitis C he had only nine months left on his sentence.  It is DOC policy that

inmates with less than 18 months left on their sentence will not receive the treatment

because it requires 12 months to complete and disrupting the treatment before it is

completed can cause complications.  After completion of the studies and biopsy

required to get the treatment started, Plaintiff would not have had time to get started on

the treatment.

Bryan was also familiar with Plaintiff's knee problems, which resulted from an

injury in 1989.  Most of his type of injuries resolved without the need for surgical

intervention, and a brace and medication is used only in the initial phases, with later

goals being to return the person to normal activity.  Plaintiff was given an elastic knee

brace, but he did not use it.  He wrote numerous requests and grievances, but because

he did not follow sick call procedure she went to visit him and explain it at which time he

showed her his knee issues.  She documented her observations in a medical note dated

**No. 4:05cv450-MP/AK**

January 11, 2006, and sent them to Dr. Cherry which were that no problems were noted, no limited use of knee, he was able to kneel down, no edema, no discoloration or deformity, and no indication of pain in bending and rising to a full upright position. Sick call procedure was explained and Plaintiff saw a doctor on December 5, 2005, at which time the request for the brace was denied, but OTC Motrin prescribed. No further sick call requests were made related to his knee and she had no further encounters with him, although he left the medical building angry when she told him that his grievances were not the proper method for obtaining medical care.

k)    Record of Health Care (exhibit H)

Note of January 11, 2006, repeats what Nurse Bryan related in her affidavit. On that same date Plaintiff requested a response to his ADA request form which had been sent to the ADA coordinator and a response would be forthcoming.

l)    Nursing Assessment dated October 16, 2005 (exhibit I)

Plaintiff complaining of right flank pain, urinary tract infection suspected and medication called in by Dr. Velasco.

m)    Record of Health Care (exhibit J)

Shows Plaintiff requested knee brace on 12/27/05, 12/30/05, 1/5/06, and 1/9/06.

n)    Affidavit of Susan Pinkard (exhibit K)

She saw Plaintiff on sick call and remembers he wanted a knee brace, but his knee appeared normal with no swelling, no decrease in movement, no crepitus, no effusion, and she was unable to give him a brace regardless of her examination, the doctor made that decision.

**No. 4:05cv450-MP/AK**

o)      Nursing Assessment of Pinkard dated 9/27/05 (exhibit L)

Pinkard's examination notes match her affidavit.

p)      Inmate Transfer History (exhibit M)

Plaintiff was released upon expiration of sentence on April 12, 2006, and re-incarcerated on a new commitment on March 22, 2007, and he was incarcerated in New River Correctional Institution.

q)      Affidavit of Dr. Joseph Hernandez (Doc. 123, Exhibit A)

Hernandez was Chief Health Officer at Madison DI from 11/4/2005 through 9/30/2006, and recalls Plaintiff presented to him complaining about knee pain and that his brace had been taken away when he came to prison.  He examined the knee and found it to be stable with no obvious laxity or swelling for which a brace would be indicated.  Ligament tears or sprains typically heal within three weeks of injury and Plaintiff's knee had been injured several years earlier.  His knee brace, which he brought with him from the VA, was unnecessary and he needed to strengthen his leg, which would be hindered by using a brace. Surgery was required for a meniscus tear, it will not heal by itself, and is not helped by use of a brace.  It is also elective.  Hernandez also examined him for liver illness and found his enzymes to be slightly elevated, but not significant enough to be referred for treatment.

r)      Grievances dated 12/5/05, 12/6/05, and 12/24/05 (exhibits B1 -B3)

All grievances related to his knee pain and requests for a brace were responded to within days of the request.

**No. 4:05cv450-MP/AK**

s)    Health Slip/Pass dated 12/5/05 to 12/5/ 06 (exhibit C)

Plaintiff was given an elastic knee brace from Dr. Hernandez.

## IV.    Plaintiff's relevant evidence in response (doc. 173)

Plaintiff submitted over 600 pages of exhibits with his response.  The Court has

attempted to summarize its review thereof, but Plaintiff did not number the pages within

each exhibit, so there will be no page references.  Only relevant information will be

discussed, which does not include information related to other inmates concerning their

issues with these defendants or medical records that concern other medical conditions

which are not relevant to these claims or which are not specifically referenced or their

significance otherwise explained in Plaintiff's memorandum.

To summarize, Plaintiff complains that the medical staff at Madison Correctional

Institution did not give him a knee brace or better medication for his knee problem, even

though the VA had found significant knee issues that would cause pain and require

surgery.  When Plaintiff was re-arrested and incarcerated at New River CI he got his

knee brace and medication, which he contends proves that medical staff at Madison CI

were deliberately indifferent to his medical needs.

With regard to treatment for hepatitis C, Plaintiff complains that it was deliberate

indifference by Madison CI to delay his treatment on the grounds that his release in May

2006 was too soon to start it, and again, he received the treatment when he was placed

in New River, which he claims shows that it should have been done at Madison.

Plaintiff was incarcerated first on January 6, 2005, and released on April 12,

2006.  He entered Madison CI with internal derangement of his knee and Hepatitis C.

**No. 4:05cv450-MP/AK**

(Exhibit G). He was deemed asymptomatic for Hepatitis C at this time. His initial physical exam on January 25, 2005 showed positive for hepatitis C since 2004, and injuries to his left shoulder and right knee. He was given Motrin, a low bunk pass until 4/25/05 and a soft knee brace, also until 4/25/05. He was cleared for work release. He listed right knee condition and swollen or painful joints under his medical history. He was scheduled for x-ray by Dr. Nguyen on 1/25/05.

A nursing assessment by Defendant Pinkard on September 27, 2005, shows that he was examined for right knee pain and found to have no edema, no discoloration, and a normal gait. He requested a knee brace, but no treatment was deemed required.

Plaintiff made a "Reasonable Modification or Accommodation Request" on November 9, 2005, complaining of knee pain and requesting a brace, medication, orthopedic shoes, bottom bunk pass, no prolonged standing pass, soft shoe pass, orthopedic consultation, an MRI and x-rays. The request was denied on 12/6/05 after examination of the knee was negative and Plaintiff was able to walk "perfectly" without pain. This decision was in accord with the Chief Health Officer's decision.

Examination on 1/11/06 revealed no edema, discoloration, able to kneel, no limited use or range of motion in right knee, no evidence of pain, and Defendant Bryan educated him on proper channels for accessing medical care. Plaintiff was told that his medical needs should be initiated by sick call requests, not filing grievances, and he admitted to her that he went to sick call one time and was denied a brace.

**No. 4:05cv450-MP/AK**

Plaintiff's second relevant period of incarceration was on March 22, 2007, through February 9, 2009, at New River CI. He was identified with Hepatitis C and referred to the gastrointestinal clinic immediately. (Exhibit D). An early nursing Assessment dated 5/1/07 reflects Plaintiff complained of right knee pain and his knee going "out" several times a day from an injury in 1994. (Exhibit A). The nurse noted no swelling, but that Plaintiff was wearing a knee support and wanted a brace and orthopedic consult. An appointment was made with the doctor. On July 24, 2007, consultant Dr. Carlos Esquivia wrote a prescription for a knee brace noting that an MRI done in 2004 showed complete rupture of PCL and an old tear of the medial meniscus. (Exhibit B). Plaintiff told him he wanted to have his surgery at the VA when he was released, but he wanted a brace so he could ambulate with more stability. Dr. Bala at New River wrote restrictions on lifting, pushing, and pulling over 10 pounds and for low bunk, gave him a knee brace and prescribed Motrin. (Exhibits C and D).

The voluminous treatment notes during his incarceration at New River show almost weekly complaints, incidental notes and grievances regarding treatment, disagreements with the type of medication prescribed, and disagreement with test results causing the writer to make notations that he was a continual complainer who filed grievances and made threats of lawsuits. (Exhibit H). Tests conducted include MRI and x-rays of the knees, hips, and lumbar spine, a liver biopsy, a liver sonogram, nerve conduction studies, CT scan of the pelvis, and many, many blood work tests. Most of the tests were normal or within normal limits. An MRI of the lumbar spine showed mild degenerative changes in the lumbar spine, and hepatic changes consistent

**No. 4:05cv450-MP/AK**

with hepatitis C disease. An MRI of the right knee on July 2, 2007, shows a meniscal tear, fluid in the corner of the knee joint signifying a cyst or ganglion, with joint narrowing laterally and early to moderate degenerative changes. When told surgery would fix the tear, he stated he would prefer to wait until he got out to have the VA fix it. He insisted on using a brace, which was apparently allowed at New River, and interestingly, ended up causing him problems with numbness and pain in his right hip. A neurological consult with testing (including an MRI of both hips and nerve conduction studies) was arranged on suspicion of sciatic nerve problems, but all tests were normal. One of the recommendations was to take rest periods from wearing the knee brace.

## V.    Analysis

### a)    Deliberate Indifferent to Medical Needs

Medical claims under the Eighth Amendment have an objective and subjective component, each of which additionally is considered to encompass two subsidiary requirements. Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000), cert. denied, 531 U.S. 1077, 121 S.Ct. 774, 147 L.Ed.2d 673 (2001). The "objective component" of the Eighth Amendment standard requires a determination whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation. See Wilson v. Seiter, 501 U.S. 294, 303, 111 S.Ct. 2321, 2326, 115 L.Ed.2d 271 (1991). This objective component varies with the situation and the conduct in question and is responsive to "contemporary standards of decency." Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976); see also Rhodes v. Chapman, 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). An objectively serious

**No. 4:05cv450-MP/AK**

deprivation requires (1) showing an objectively "serious medical need." <u>Estelle</u>, 429 U.S. at 104. A serious medical need is one that, if left unattended, "pos[es] a substantial risk of serious harm." <u>Farmer v. Brennan</u>, 511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994). In addition, an objectively serious deprivation requires (2) showing the response made by the defendant to that need was so deficient as to constitute "an unnecessary and wanton infliction of pain" and not simply "negligen[ce] in diagnosi[s] or treat[ment]," or even "[m]edical malpractice" actionable under state law. <u>Estelle</u>, 429 U.S. at 105-06 (internal quotation marks omitted). <u>See</u> <u>Taylor</u>, 221 F.3d at 1257; <u>see also</u> <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th Cir. 2003).

A serious medical need is considered "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." <u>Farrow</u>, at 1243, quoting <u>Hill v. Dekalb Regional Youth Detention Center</u>, 40 F.3d 1176, 1187 (11th Cir. 1994).

To show the required subjective intent to punish the plaintiff must demonstrate that the defendant acted with an attitude of "deliberate indifference." <u>Estelle</u>, 429 U.S. at 105. This is defined as requiring (1) an "aware[ness] of facts from which the inference could be drawn that a substantial risk of serious harm exists" and (2) the actual "draw[ing of] the inference." <u>Farmer</u>, 511 U.S. at 837. In sum, in a claim of denial of medical attention under the Eighth Amendment "[u]ltimately, there are [] four requirements: an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts." <u>Taylor</u>, 221 F.3d at 1258.

**No. 4:05cv450-MP/AK**

Plaintiff's complaints are two fold:  that he should have been given a knee brace and Interferon treatment for Hepatitis C while incarcerated at Madison CI, and the fact that he received both these requests from New River CI, when he was re-incarcerated in 2007, "proves" that he should have received them from Madison.[2]  This is very clearly a disagreement in diagnosis, treatment, and care with the medical staff at Madison, which does not state a claim for relief under the Eighth Amendment.  A purely medical judgment "that in hindsight...may have been poor or even that it may have constituted negligence or medical malpractice does not elevate Plaintiff's claim to a tort of constitutional dimensions."  Pate v. Peel, 256 F. Supp.2d 1326, 1327 (N.D. Fla. 2003), citing Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (differences in opinion between medical staff and inmate do not state Eighth Amendment claim).

The medical staff at Madison performed a number of examinations and made observations of his right knee which revealed no swelling or discoloration and showed that Plaintiff was able to kneel, stand upright quickly from a kneeling position, and ambulate normally.  Based upon their medical judgment, they did not deem it necessary to provide him a knee brace.  It was their medical opinion that a brace would hinder the strength development they deemed important to his recovery.  The fact that New River took a different approach to his condition does not prove that Madison medical personnel were indifferent to his needs, only that they had different medical judgments attendant to their findings.  Likewise with the treatment for his hepatitis C.  When he first

---

[2]  Although he also alleges that he was required to work beyond his physical capabilities, there is no evidence or specific facts before the Court related to his work assignments or problems he experienced attempting to perform work duties.

**No. 4:05cv450-MP/AK**

came to Madison he was asymptomatic. He has not provided treatment notes or sick call requests reflecting complaints of fatigue or other problems related to hepatitis while incarcerated at Madison, and Dr. Cherry's explanation for why no treatment regimen would be initiated with only months remaining on his sentence indicates, again, his medical judgment. When Plaintiff came into New River, he was signed up for the clinic where liver biopsies and blood work revealed some compromise of function and he began to complain of fatigue. Given that he was going to be there for two years, it obviously altered the situation such that in the medical judgment of the staff there at New River he could and should undergo the complete regimen of treatment.

Finally, Plaintiff has not shown that any alleged delay or denial of treatment by the staff at Madison CI caused him any injury. He purportedly had a right meniscal tear when he went in to the system in 2005, and had it when New River took an MRI in 2007. He had already decided that he would wait for the VA to repair the tear, which apparently he did not elect to do while he was out of prison for nearly a year. It is not clear whether the brace he so adamantly wanted at Madison was the right choice or not since only surgery would repair the tear that was the primary cause of his instability and pain, and when he was allowed to wear the brace at New River it caused additional problems in his hip.

It is also interesting that although he points to New River's treatment of him as proof that something was amiss at Madison, the incidental notes, particularly those of Ms. Stevens, show that Plaintiff approached the medical staff at New River in the same fashion he had at Madison, with numerous grievances and complaints based on his

**No. 4:05cv450-MP/AK**

disagreement with their medical decisions.  He had to be counseled at New River, just as he had at Madison, on the appropriate method for obtaining medical care, i.e. sick call requests rather than grievances, and he took this approach even though he was given a brace, strong pain medication, and testing for every complaint he made.   There are some people who simply cannot be satisfied, and the Constitution was not written to protect their right to complain unendingly.

There is no merit to this claim.

b)     Declaratory and Injunctive Relief

An inmate's claim for injunctive or declaratory relief in a 1983 case is rendered moot upon his transfer to another institution.  Spears v. Thigpen, 846 F.2d 1327, 1328 (11th Cir. 1988), citing Wahl v. McIver, 773 F.2d 1169, 1173 (11th Cir. 1985).  See also Smith v. Allen, 502 F.3d 1255, 1266-67 (11th Cir. 2007); Zatler v. Wainwright, 802 F.2d 397, 399 (11th Cir. 1986).

Plaintiff is now free world, and the medical staff of the Department of Corrections is no longer tasked with the responsibility of his medical care even were the Court to direct them to.

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendants' motions (docs. 121 and 123) are **GRANTED**, and Plaintiff's second amended complaint

(doc. 42) be **DISMISSED** for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2).

**IN CHAMBERS** at Gainesville, Florida, this __*12th*__ day of January, 2010.

**No. 4:05cv450-MP/AK**

_s/ A. KORNBLUM_
**ALLAN KORNBLUM**
**UNITED STATES MAGISTRATE JUDGE**

<u>**NOTICE TO THE PARTIES**</u>

A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.

**No. 4:05cv450-MP/AK**